SWANKE, Respondent vs. HERDEMAN and others, imp., Appellants.

*March 11—March 30, 1909.*

*Sales: Fraud: Knowledge with which purchasers are chargeable: Unsoundness of horse: Questions for jury: Tender of rescission: Defects: Waiver: Nonnegotiable notes: Signature procured by fraud: Delivery: Appeal: Costs: Printed case violating rule.*

1. Purchasers of a horse, defending on the ground of fraud an action on a note given for the price, are chargeable with knowledge, at the time of purchase, of such facts only as were obvious to them in view of their capability to observe and the opportunities accorded them.

2. Upon the evidence in such an action it is *held* that the questions whether the purchasers of a stallion represented as sound and as having been newly imported had such notice of physical defects or such opportunity for observation that they were chargeable with knowledge thereof, and whether, after discovery of the unsoundness, there had been an election to retain the stallion or such unreasonable delay in notifying the vendor of an election to rescind the sale as would estop the purchasers from their right to rescind, should have been submitted to the jury.

3. Technical insufficiencies in a tender of rescission and return by purchasers may be waived by a categorical and absolute refusal of the vendor to entertain the proposal at all.

4. Where the signers of a nonnegotiable note, or some of them, were induced to sign it upon the understanding that, although it remained in the hands of the payee to obtain more signatures, it was not to be delivered so as to take effect until signed by a certain number of responsible makers, and it was not in fact so signed, it had no effect or existence as a promissory note as against the signers.

5. No costs are allowed for the printing of a case which contains the whole testimony *in extenso*, in violation of Supreme Court Rule 6.

APPEAL from a judgment of the circuit court for Shawano county: JOHN GOODLAND, Circuit Judge. *Reversed.*

Action on a nonnegotiable joint and several note, given for a stallion sold to the defendants by one Keller, who was in fact agent for himself and several others; the note having

been transferred to the plaintiff with a guaranty signed by the former owners of the horse. The first defense was fraud in falsely representing the horse as then newly imported from reputable dealers in Illinois and as being sound, and that upon learning their falsity the defendants had rescinded, notified Keller, offered to return the horse and demanded surrender up of the note, which offer and demand had both been refused. Another defense was that the note had never come into effect, because never signed by fifteen responsible share-takers, and certain of the signatures were colorable only, being under a secret and fraudulent agreement that Keller should pay for and protect such signers.

The evidence tended to show the following facts: That a subscription was procured nominally for shares in the horse on the understanding that fifteen shares of $200 each were to be subscribed before the subscriptions should become effective and the note signed by fifteen responsible parties before it should take effect. After fifteen ostensible subscribers had been obtained this note was signed by twelve of them, one pretending to take two shares. Two or more of the shares were ostensibly paid for in cash, but really with money furnished by Keller to the subscribers privately and paid back to him in presence of the defendants or most of them. Keller, both at the time of taking the subscription and subsequently at the time of the signing of the note, made definite representation as stated in the answer. The horse was at all times in a barn in Symco so situated that he could not be inspected easily. Most if not all of the defendants were not expert horsemen qualified to know by hasty observation as to soundness, and various acts of Keller were testified to in the way of haste and excuses tending to obstruct or divert from careful inspection. After the horse was delivered he was found to be weak in the ankles and to have what are described as "cocked ankles." It was also learned that he had not been directly imported from the dealers in Illinois, but had been owned by

an association known as the Tigerton Horse Association, and had already been bred for the preceding season at and near Tigerton, about twenty miles from defendants' residences. Shortly after the ascertainment of these facts, except the non-joinder of the two or three ostensible subscribers, the defendants sent a delegation of their number to interview Keller and attempt to secure rescission, which they did, and were met with an absolute refusal to rescind, followed by a promise by Keller to come to Symco and meet the subscribers. After some delay and further solicitation he did so, and an oral offer of rescission and return was made to and unqualifiedly refused by Keller. Afterwards a written tender of rescission and return was made and a suit in equity was commenced to declare rescission and cancellation of the note, which was dismissed on the ground that defendants had an adequate legal remedy by defense. See *Johnson v. Swanke*, 128 Wis. 68, 107 N. W. 481. No use was made of the horse by the defendants, and after a time he was sold adversely in enforcement of a lien for his keep, and was bid in by three or four of his former owners. Evidence was introduced tending to show that the weakness of ankles was a congenital defect likely to be communicated to his progeny, and that it greatly impaired, if not destroyed, his value for the known purpose of his purchase as a breeding stallion.

At the close of the trial a verdict was directed for the plaintiff and judgment entered thereon, from which the defendants appeal.

For the appellants there was a brief by *Browne, Browne & Fisher*, and oral argument by *E. E. Browne*.

For the respondent there was a brief by *Goodrick & Goodrick*, attorneys, and *Kreutzer, Bird & Rosenberry*, of counsel, and oral argument by *C. B. Bird*.

DODGE, J.   The record discloses evidence which would justify a jury in finding the making, the falsity, and materiality

of the two alleged misrepresentations, namely, that the horse
had been freshly imported from a well-known and responsible
firm of dealers in Illinois and that he was sound in every re-
spect and suitable for breeding purposes.   Indeed there is
nothing to indicate that the trial court decided otherwise.
The direction of verdict apparently was based upon the view
that the defendants had not been diligent before signing the
note to ascertain as to the falsity of such representations, and
that they had not promptly exercised any right of rescission
that they might have had after discovery of such falsity.   Of
course, to justify the court's action, these facts must have ap-
peared conclusively, and without any evidence which, in any
view thereof, and with most favorable intendments and in-
ferences to the defendants, tended to prove the contrary.   The
character of the opportunity and the degree of diligence re-
quired of the purchaser of property in order to preclude be-
lief in his reliance upon misrepresentations made by the seller
has been so often discussed that no repetition is necessary.
*Jacobsen v. Whitely, ante,* p. 434, 120 N. W. 285; and au-
thorities there collected.   Under the rule stated in that case
the defendants are chargeable with knowledge only of such
facts as were obvious to them in view of their capability to ob-
serve and the opportunities accorded them.   With reference
to the physical defects in the horse, while ascertainable by a
careful inspection made by a skilled horseman or veterinary,
there was much evidence of the incapacity of any of these
defendants to observe and appreciate either the fact or the
significance of the horse's unsoundness, even had he been
fully exhibited to them, and there was also much evidence of
conduct on the part of the seller tending to delude and divert
many of them from such inspection; also that this conduct
was accompanied by the practical bribery of two or three of
the ostensible share-takers upon whose judgment the others
evidently relied to some extent, and whose favorable attitude
toward the trade was thus influential, as it might be inferred

that Keller well knew and intended. These and the many other circumstances were in our judgment sufficient to raise a question of fact for the jury whether or not these defendants had such notice of the physical unsoundness of the horse or such opportunity for observation that they could not have been ignorant thereof without closing their eyes to plain facts. As to falsity of the representation of direct importation of the horse there is little, if any, showing of any opportunity to discover it before consummation of the sale. It was not until investigation was made, some twenty miles from where they resided, that the fact of previous use in the vicinity, or any suspicion of it, is shown to have come to the defendants.

Neither can we agree with the trial court that the evidence was conclusive of either an election to retain the horse or of unreasonable delay to notify the seller of defendants' election to rescind after the discovery of the unsoundness. Certain physical infirmities were discovered by one of the defendants the day after the purchase; but whether they constituted material unsoundness or merely some temporary illness and were immaterial could not at once be ascertained. Considerable time was necessary for him to communicate with the other defendants, and for them, in association, to obtain advice and information as to the character of these defects. Then, two or three days after the infirmities had come to the knowledge of the defendants, and within approximately two weeks after the transfer of the horse, they made up and appointed a committee who forthwith proceeded to investigate as to the history of the horse, and to that end made a trip to Tigerton, and thence to a neighboring town, to meet Keller, to whom they notified their desire to rescind, receive back their note, and give up the horse. Any delays thereafter were due to Keller rather than to the defendants. Meanwhile no use whatever was made of the horse. We are satisfied that a jury might well have concluded from all the facts and circumstances that no unreasonable delay had intervened such as

would estop the defendants from their right to rescind, nor any ratification or affirmance of the sale.

Some technical insufficiencies in the tender of rescission and return. are urged by respondent, but evidence tended to show so categorical and absolute refusal by Keller to entertain the proposal at all that it might be reasonably inferred that any more complete tender would have been futile, and was waived.

As to the second defense, there was evidence tending to prove almost the identical situation discussed in *Hodge v. Smith,* 130 Wis. 326, 110 N. W. 192. Upon the authority of that case, if the jury believed that these defendants or some of them were induced to sign this note upon the understanding that, although it remained in the hands of Keller to obtain other signatures, it was not to be delivered so as to take effect until signed by fifteen responsible signers, and that it had not in fact been so signed in good faith, then it had no effect or existence as a promissory note as against any of these defendants. *Aukland v. Arnold,* 131 Wis. 64, 111 N. W. 212. We have no doubt that there was evidence from which a jury might have so found, and might also have found that there were no acts on the part of the defendants signifying an election to ratify the purchase after discovering the nonsignature or fictitious signature of the note.

The printed case on this appeal is an egregious infraction of Supreme Court Rule 6, providing that appellant "shall print a case containing an abridgment of the record, so far as necessary to present the questions for decision." It is in no sense an "abridgment," for the whole testimony is printed *in extenso,* question and answer, with all its needless and unhelpful repetitions, to the unnecessary extension of the case by nearly one half and to the very considerable aggravation of the routine labors of this court. Rule 44 prohibits the allowance of any costs for the printing of such a case.

*By the Court.*—Judgment reversed, and cause remanded for new trial; no costs for printing case.